**Bartolome E. ABUAN, et al., Plaintiffs,**

v.

**GENERAL ELECTRIC CO., a corporation, and Monsanto Co., a corporation, Defendants.**

**No. CV 90–0031.**

United States District Court,
D. Guam.

April 20, 1990.

As Amended May 8, 1990.

Mesirov, Gelman, Jaffe, Cramer & Jaimeson, Leon Rose, Alan C. Milstein, Philadelphia, Pa., Cunliffe, Cook, Maher & Keller, John B. Maher, Agana, Guam, for plaintiffs.

Bronson, Bronson & McKinnon, Charles F. Preuss, Barbara L. Major, San Francisco, Cal., Klemm, Blair, Sterling & Johnson, J. Bradley Klemm, Agana, Guam, for Monsanto Co.

Moore, Ching, Boertzel & Lawlor, John E. Moore, Agana, Guam, for General Elec. Co.

## ORDER RE DEFENDANT MONSANTO'S MOTION TO DISMISS
[Fed.R.Civ.P. 12(b)(2) ]

KELLER, District Judge, Sitting by Designation.

This is a class action suit involving 189 named plaintiffs who claim injury due to exposure to an allegedly toxic chemical manufactured by defendant Monsanto. Plaintiffs assert four causes of action against Monsanto: negligence and outrageous conduct, strict liability, breach of warranty and civil conspiracy. Presently, Monsanto moves the Court to dismiss the Complaint against it under Fed.R.Civ.P. 12(b)(2). Monsanto claims that it does not have the sufficient minimum contacts with the forum to support the exercise of personal jurisdiction. For the reasons which follow, the motion is DENIED.

### BACKGROUND

On May 26, 1987, a hose on a 2000 kVA transformer at the Piti Power Plant on the United States Naval Base in Guam ruptured and emitted Polychlorinated Biphe-

nyls (PCBs), allegedly contaminating the named plaintiffs and others in a purported class. The PCBs were manufactured by Monsanto. Monsanto had sold PCBs to General Electric (GE) by the railcar tank-load during the seventies and earlier. GE used PCBs in a dielectric solution as insulation in the transformers and other electrical devices. In 1949, GE sold the subject transformer to the Navy and delivered it to Guam equipped with insulation that included PCBs manufactured by the defendant Monsanto.

Before 1977, when PCB production was halted due to the determination that they were environmentally unsafe and posed potential health hazards, Monsanto had manufactured over a billion pounds of them. They were put into the stream of commerce through industrial buyers who, having used PCBs in their products, distributed them throughout the globe. All of Monsanto's distribution of PCBs into ultimate use was therefore indirect. Monsanto does not—because the nature of its business does not require it to—have retail or distribution outlets throughout the world or the nation.

Monsanto does not and never has had any direct contacts with Guam which relate to PCBs. While Monsanto used to distribute significant amounts of PCBs to GE, which was its largest purchaser, it has never had any direct distribution to Guam. Monsanto has never had any sales office there, has never advertised there, has never had any method of distributing its products there, and has never solicited any purchases there. Monsanto has never had an employee, agent, office, telephone or bank account in Guam. Furthermore, Monsanto has never sent an employee to Guam on any business-related activity nor has it specifically designed a product for use in Guam.

Monsanto's only contacts with Guam are unrelated to PCBs. In 1976 and 1977 Monsanto sold to Pan American Airways a hydraulic aviation fluid called Skydrol, which was delivered f.o.b. to Pan Am in the continental United States and used by Pan Am in Guam. Monsanto also is aware that fibers which it manufactured have made their way to Guam in Wear–Dated carpets. Monsanto also profits from the sale of a product called Roundup, an agricultural product distributed by Monsanto to a firm in Hawaii, Brewer Chemical, and through Brewer to Guam.

Despite its apparent lack of local contacts, Monsanto has a pervasive and worldwide presence. It is listed on seven stock exchanges and financially supported by sales throughout the world. Because Monsanto largely manufactures wholesale products, it has been able to advantage itself of the distribution capacity of its customers, like GE, who promote their products, with Monsanto components, directly to consumers.

## DISCUSSION

Monsanto contends that this Court cannot exercise personal jurisdiction over Monsanto in Guam without running afoul of the Due Process clause of the United States Constitution. Plaintiffs take a contrary view in an argument directed less to contacts than to emotion. Monsanto is a corporate giant on seven stock exchanges; what injustice is it to hale them into Guam? They have already been sued in over 300 cases over PCBs and should be called to defend the integrity of their product in Guam. The law in this area, however, requires a systematic analysis of the contacts Monsanto maintains in determining whether the assertion of personal jurisdiction would be consistent with this Court's authority under Guam's long arm statute and the Due Process clause.

The Court's authority to exercise jurisdiction is governed by Guam Civil Code § 406.1. That statute permits the exercise of jurisdiction up to and including all that is constitutionally permissible. Constitutional jurisdiction is governed by Due Process. In turn, Due Process requires that a defendant have certain minimum contacts such that maintaining suit against it does not offend traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In

practice, this results in the exercise of jurisdiction in two ways. A Court may exercise "general jurisdiction" where a defendant's activities in a state are "substantial," or "continuous and systematic," "regardless of the connection to the present litigation." *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 446–47, 72 S.Ct. 413, 418–19, 96 L.Ed. 485 (1952). A Court may alternatively exercise "limited," or "specific" jurisdiction, where the defendant's contacts with the forum, though limited, are sufficiently related to the cause of action. Each is discussed in turn.

### General Jurisdiction

■ "[E]ven if a cause of action is unrelated to the defendant's forum activities, jurisdiction may still be asserted if corporate activities within the forum are sufficiently substantial." *Congoleum v. DLW Aktiengesellschaft*, 729 F.2d 1240, 1241–42 (9th Cir.1984), citing *Perkins v. Benguet*, 342 U.S. 437, 446–47, 72 S.Ct. 413, 418–19, 96 L.Ed. 485 (1952). Contacts are "sufficiently substantial" when they are "systematic and continuous." *Data Disc, Inc. v. Systems Tech. Assoc.*, 557 F.2d 1280, 1287 (9th Cir.1977). In *Congoleum*, the defendant moving for dismissal for lack of jurisdiction had numerous activities in California. These included the solicitation of orders, recommendation of other sales agents, ordering of samples, promotion of its products through mail and showroom displays, and attendance at trade shows. The Ninth Circuit held these activities insufficient to "make it reasonable and just to subject the corporation to the jurisdiction" of California. *Congoleum*, 729 F.2d at 1243, quoting *Perkins v. Benguet*, 342 U.S. at 445, 72 S.Ct. at 418.

■ In the present case, Monsanto has contacts with Guam only through third party intermediaries. Skydrol reached Guam through Pan Am, Roundup through Brewer Chemical, and Wear–Dated carpet through similar conduits. Monsanto has never had an office or presence in Guam whatsoever. There is, therefore, insufficient activity to support the exercise of general jurisdiction; it would be an uncontemplated extension of this Court's constitutional reach. *See Congoleum*, 729 F.2d at 1242 ("[a]lthough many courts cite *Perkins* for the principle that personal jurisdiction may be asserted where the cause of action is unrelated to the forum activity, no court has ever held that the maintenance of even a substantial sales force within the state is a sufficient contact to assert jurisdiction in an unrelated cause of action").

### Limited Jurisdiction

■ The exercise of limited jurisdiction is appropriate where the claims arise directly out of the party's activities in a forum state or territory. These are the minimum contacts contemplated in *International Shoe* for supporting jurisdiction, and the Ninth Circuit applies a three-part test for determining when its exercise is appropriate.

1. The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which it purposefully avails itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protection of its laws;

2. the claim must be one which arises out of or results from the defendant's forum related activities; and

3. the exercise of jurisdiction must be reasonable.

*Data Disc. Inc. v. Systems Tech. Assoc., Inc.*, 557 F.2d at 1287.

In aiding the consideration of the last factor, "reasonableness," there are several relevant considerations: the extent of the purposeful interjection in the forum, the burden on defendant in going there, the danger of conflict with the sovereignty of a defendant's domicile, the forum state's interest in adjudicating the dispute, the most efficient judicial resolution of the controversy, the importance of the forum to plaintiff's interest in efficient relief, and the existence of an alternative forum. *Sinatra v. National Enquirer*, 854 F.2d 1191, 1199 (9th Cir.1988); *Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1481 (9th Cir.1986). These factors are not

rigid, mechanical tests as defendant urges them to be, but merely advisory; the list is not exhaustive. *Id.; Insurance Co. of North America v. Marina Salina Cruz,* 649 F.2d 1266, 1270 (9th Cir.1981).

■ The Court is satisfied that the second and third prongs of the test are met. "But for" the existence of Monsanto's PCB's in Guam, there would be no claim. Thus, the claim certainly arises out of Monsanto's contact with Guam. *See Scott v. Breeland,* 792 F.2d 925, 928–29 (9th Cir.1986) ("arising out of test" one of factual causation). Further, the exercise of jurisdiction is clearly reasonable. As reviewed in the hearing on this matter, the seven factors do not weigh against the assertion of jurisdiction, but for it. The burden on Monsanto in defending a suit here in Guam is not great. There is no threat of conflict with the sovereignty of defendant's domicile, as Guam's law is bound to govern the suit. Guam's interest in the litigation is paramount, as there are 189 named plaintiffs in a class that, still unenumerated, promises to be considerable, and entirely in Guam. The most efficient judicial resolution of the suit commands that it be consolidated; severing Monsanto for litigation in a distant forum portends duplication and piecemeal adjudication, an inefficient result. The plaintiffs' demand for relief can most expeditiously be addressed, too, in a single forum. And while there are alternative fora, certainly, none is more appropriate than this Court. Thus, the second and third prongs are satisfied and permit the exercise of jurisdiction.

■ However, the Court cannot exercise jurisdiction on the strength of the first two prongs unless it also determines that Monsanto has, under the first prong, "purposefully availed" itself of Guam. *McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 817, n. 10 (9th Cir.1988); *Raffaele v. Compagnie Generale Maritime,* 707 F.2d 395, 397 (9th Cir.1983); *Data Disc, Inc. v. Systems Tech. Assoc., Inc.,* 557 F.2d at 1287. This is the focus of the dispute between the parties and the issue to which the Court now turns.

Purposeful Availment

In *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 105, 107 S.Ct. 1026, 1029, 94 L.Ed.2d 92 (1987), Justice O'Connor framed the issue which closely parallels the one faced by this Court.

[W]hether mere awareness on the part of a foreign defendant that the components it manufactured, sold, and delivered outside the United States would reach the forum State in the stream of commerce constitutes "minimum contacts" between the defendant and the forum State such that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'"

*Id.* (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). Having framed the question, the Supreme Court in resolving the case did not answer it. Four members of the Court required that the defendant place its product into the stream of commerce and do something more to make the exercise of jurisdiction fair. *Id.,* 480 U.S. at 108–13, 107 S.Ct. at 1031–33. Five concurred in the result—that jurisdiction was improper—because of the peculiar nature of the case: a foreign defendant and a foreign plaintiff suing in California over a dispute that was of little interest to the state, concluding that jurisdiction would be unreasonable. *Id.* at 116–22, 107 S.Ct. at 1035–38.

Because the Supreme Court left open the issue as to whether the deposit of a component into the stream of commerce would be enough to hold that a defendant "purposefully availed" itself of a forum State, this Court must reopen the uncompleted analysis of *Asahi* and its precedent and turn to the Ninth Circuit's stance on "purposeful availment."

In *Asahi,* a Taiwanese company manufactured a valve which was incorporated into a tire manufactured by another Taiwanese company, installed on a Honda motorcycle, shipped to California, and blamed for the tire's deflation that resulted in a serious accident. The personal injury suit against the tire manufacturer settled, but

the manufacturer cross-claimed against Asahi for indemnification. The valve manufacturer, Asahi, moved to dismiss for lack of personal jurisdiction. The California Supreme Court held

> Asahi's intentional act of placing its components into the stream of commerce—that is, by delivering the components to Cheng Shin in Taiwan—coupled with Asahi's awareness that some of the components would eventually find their way into California, [was] sufficient to form the basis for state court jurisdiction under the Due Process Clause.

*Asahi,* 480 U.S. at 108, 107 S.Ct. at 1031. The United States Supreme Court, in a splintered decision, reversed. Justice O'Connor framed the issue as previously quoted and in part II–A held that merely putting something into the stream of commerce was not sufficient to confer jurisdiction.

Justice O'Connor, joined by the Chief Justice, as well as Justices Powell and Scalia, held that in order to satisfy the first prong of the Ninth Circuit test—purposeful availment—there must be "an action of the defendant purposefully directed toward the forum state." *Asahi,* 480 U.S. at 112, 107 S.Ct. at 1033, citing *Burger King v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985).

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Id.* This formulation, what this Court will refer to as the "stream-of-commerce plus" test, would not result in the assertion of personal jurisdiction in the present case, as Monsanto has manifested none of the *plus* conditions required in Justice O'Connor's plurality opinion.

Justice O'Connor's discussion in *Asahi* relied heavily on language from *World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), where the Court ruled that a consumer's unilateral act of bringing a defendant's product into a state was not sufficient to support the exercise of jurisdiction. *Id.* at 295–96, 100 S.Ct. at 566. There must be stream-of-commerce *plus:* in *World–Wide Volkswagen,* that *plus* was the expectation of being haled into court in the forum State. *Id.* at 297–98, 100 S.Ct. at 567. While the question whether a party has an expectation of being haled into court is necessarily tautological—that is, if the Supreme Court rules that putting an item into the stream of commerce results in the proper exercise of jurisdiction, then a defendant who does so necessarily expects to be haled into court there—the "reasonableness" of the expectation provides a workable basis for examining what the *plus* is in Justice O'Connor's analysis, reconciling the reasonableness focus in Justice Brennan's concurrence, and harmonizing Justice Steven's separate concurrence which focused on the nature and quality of a defendant's conduct (in addition to the act of placing a product into the stream of commerce) to determine whether a party purposefully availed itself of a forum state. *Cf. International Shoe,* 326 U.S. at 310, 66 S.Ct. at 154 ("whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure"). So while it is clear that at least four Justices from *Asahi* would not assert jurisdiction over Monsanto for having let its PCBs pass into Guam, it appears that the remainder of the Court would have on the basis of their disagreement with Justice O'Connor's qualification of the stream-of-commerce test and the reasonableness analysis prof-

fered in Part II–B and the concurring opinions.[1]

Justice Brennan, writing for four concurring justices, strongly disavowed the stream-of-commerce *plus* analysis, and refused to join in part II–A of the Court's opinion. Justice Brennan rejected the qualification which Justice O'Connor placed on the stream-of-commerce theory and undermined her reliance on *World–Wide Volkswagen* by pointing out that in that case, the Court focused upon the expectation of the producer-defendant, and the distinction between a *sale* in the forum State and the *consumer's unilateral act* in carrying a product to the forum State. *Asahi,* 480 U.S. at 109, 107 S.Ct. at 1031 (Brennan, J., concurring) (emphasis original).

> Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, *directly or indirectly,* the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the

stream of commerce with the expectation of that they will be purchased by consumers in the forum State.

*World–Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. at 567 (emphasis added). As the emphasized portion of the excerpt illuminates, there is no distinction to be drawn between direct and indirect sale (or distribution) but "between a case involving goods which reach a distant State through a chain of distribution and a case involving goods which reach the same State because a consumer ... took them there." *Asahi,* 480 U.S. at 120, 107 S.Ct. at 1037 (quoting *World–Wide Volkswagen,* 444 U.S. at 306–307, 100 S.Ct. at 584 (Brennan, J. concurring)). Consequently, the argument proffered by Monsanto at the hearing, that indirect distribution precludes a finding of "purposeful availment," is unfavorably exposed by an evaluation of *World–Wide Volkswagen,* the very authority upon which Monsanto's argument relies; Justice Brennan's disavowal of the *plus* limitation is well founded.

It appears from parsing the analyses in *Asahi* that five of the Justices (Brennan, White, Marshall, Blackmun, and Stevens) do not accept Justice O'Connor's limitation on the stream-of-commerce test. As explained above, Justice Brennan and the three Justices concurring with him reject it as a limitation without precedent and find it analytically unpersuasive. Justice Ste-

---

**1.** Justice Brennan and those who joined his concurrence, while disagreeing with Justice O'Connor's qualification of the stream-of-commerce test, concurred with the result because they thought *Asahi* "one of those rare cases in which 'minimum requirements inherent in the concept of 'fair play and substantial justice' ... defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities." *Id.* 480 U.S. at 116, 107 S.Ct. at 1035, quoting *Burger King,* 471 U.S. at 477–78, 105 S.Ct. at 2184–85. This is the third prong of the Ninth Circuit test, not the first, where part II–A of Justice O'Connor's opinion was trained. The reasons which prompted Justice Brennan to concur were the fact that California had only a minimal interest in the resolution of the cross-action and that the two parties were foreign nationals who would traverse great distances to subject themselves to foreign law, as well as the portent of disrupting another nation's sovereignty. *Asahi,* 480 U.S. at 114–15, 107 S.Ct. at 1034–35 (O'Connor, J., part II–B). " 'Great care and reserve should be exercised when extending our

notions of personal jurisdiction into the international field.' " *Id.,* quoting *United States v. First National City Bank,* 379 U.S. 378, 404, 85 S.Ct. 528, 542, 13 L.Ed.2d 365 (1965) (Harlan, J. dissenting); *see also Asahi,* 480 U.S. at 116, 107 S.Ct. at 1035 (Brennan, J., concurring) ("I do agree, however, with the Court's conclusion in part II–B that the exercise of personal jurisdiction over Asahi *in this case* would not comport with 'fair play and substantial justice' ") (emphasis added).

Monsanto in its briefs claims that the fact that Asahi was Taiwanese had little if anything to do with the outcome of the case. This contention is clearly wrong. Without the unusual circumstances of the case, Justice Brennan and those who joined him would have voted to exercise jurisdiction. *See Asahi,* 480 U.S. at 121, 107 S.Ct. at 1038 ("I cannot join the determination in Part II–A that Asahi's regular and extensive sales of *component parts* to a manufacturer it knew was making regular sales of the final product in California is insufficient to establish minimum contacts with California").

vens, writing separately, impugns Justice O'Connor's examination of the "plus factors" as "misapplied" and proffers a different test.

> [E]ven assuming that the test ought to be formulated here, Part II–A misapplies it to the facts of this case. The Court seems to assume that an unwavering line can be drawn between "mere awareness" that a component will find its way into the forum State and "purposeful availment" of the forum's market. [*Asahi*, 480 U.S.] at 112 [107 S.Ct. at 1033]. Over the course of its dealings with Cheng Shin [the tire manufacturer], Asahi has arguably engaged in a higher quantum of conduct than "[t]he placement of a product into the stream of commerce, without more...." [*Id.*] Whether or not this conduct rises to the level of purposeful availment requires a constitutional determination that is affected by volume, the value, and the hazardous character of the components.

*Asahi*, 480 U.S. at 122, 107 S.Ct. at 1038 (Stevens, J., concurring). Thus, Justice Stevens frames a test which satisfies the concerns of the entire Court. He requires that there be a stream-of-commerce *plus*, as Part II–A in *Asahi* argues, but requires only that the *plus* be a *reasonable* expectation of being subject to jurisdiction in the forum State. Justice Steven's view is also in closer accord with *World–Wide Volkswagen*'s "reasonableness" analysis than is Justice O'Connor's opinion which—opting for a list of rigid factors—eschews the careful, case-by-case consideration of a defendant's contacts and reasonable expectations. *See World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567 ("[h]ence if the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to others"). The reasonableness qualification on the stream-of-commerce test is further buttressed by the members of the Court who concurred with Justice Brennan in *As-ahi*, where the axis of the agreement with the O'Connor plurality was in Part II–B, the "reasonableness" of assessing jurisdiction.

The reasonableness qualification to the stream-of-commerce test, in contrast to Justice O'Connor's more objective but less realistic "plus" factors, *Asahi*, 480 U.S. at 112, 107 S.Ct. at 1033, has the appeal of common-sense and fundamental fairness. The stream-of-commerce *plus* test casts a formal distinction between an end-product supplier who deals with consumers through a network of its own distributors and the wholesaler who, even though it benefits—directly or indirectly—from the sprawling distributions of the retailer, does its selling at home. It is a disingenuous deference to form over substance to contend that an industrial wholesale supplier like Monsanto does not expect its products to arrive for use in a forum state or territory such as Guam. The connection indeed "arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its products in other States." *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567.

■ Here, where Monsanto manufactures PCBs in Alabama, but sells them by the railcar tank-load to GE, it cannot be said that Monsanto only purposefully avails itself of the Alabama forum, where the PCBs are actually sold. Compare the case where a local—a truly local—retailer sells a product to a consumer or surreptitious retailer who takes the unusual step of transferring the product to Guam, where the Alabama retailer could not have reasonably expected it to arrive and where the retailer does not appreciably benefit from the market. That is the distinction from *World–Wide Volkswagen* that sets it apart from the present case. Not only did Monsanto put PCBs into the stream-of-commerce, but it did so in such volume and in such a manner that it reasonably expected to benefit from the use of its product in Guam. To force the rigid application of *plus* factors as Monsanto urges derides the sensible focus on "fair play and substantial justice" upon which all analyses of personal jurisdiction must turn. *International Shoe v. Washington*, 326 U.S. at 316, 66

S.Ct. at 158 ("[t]he exercise of that privilege [of doing business] may give rise to obligations, and, so far as these arise out of or are connected with activities within the state, a procedure which requires the corporation to respond to suit brought to enforce them can, in most instances, hardly be said to be undue").

Finally, while this Court finds the Supreme Court's position on the requirements of minimum contacts to clearly sanction the present analysis, the split justifies reference to the Ninth Circuit's position on the issue. This position is manifested in *Hedrick v. Daiko Shoji Co.*, 715 F.2d 1355 (9th Cir.1983), where the Circuit held that a defendant purposefully avails itself of a forum if it injects its products into the stream-of-commerce, without more. In that case, the Ninth Circuit looked to the volume of sales and the expectation of a producer who sold "splices" to ocean-going vessels without notice of their ultimate destination. "Daiko performed a forum-related act when it produced a splice that it knew was destined for ocean-going vessels serving United States ports, including those of Oregon." *Id.* 715 F.2d at 1358. Like Monsanto, the producer's reasonable expectation was not one of local use. "The probability that the part sold to an ocean carrier will be used in a foreign port is not fortuitous. It is certain." *Id.* The Court distinguished the *World–Wide Volkswagen* situation where a retailer sold cars in the northeastern United States to consumers in such quantity that his reasonable expectations did not justify being sued in Oklahoma. *Id.* Thus, *Hedrick* not only manifests the Ninth Circuit's accord with the Brennan plurality in *Asahi*, but is based on facts so similar to the present case as to command the result reached here.[2]

### CONCLUSION

Monsanto, as a significant wholesale producer of PCBs, manifestly benefits from the distribution capacity of its industrial customers. Its ability to piggy-back on GE distribution saves it great expense, realized in the form of profit. It is no great logical leap to suggest that Monsanto purposefully avails itself of the fora where GE distributes Monsanto's products as components, benefitting and profiting from the purchase of those components in the forum State. This amounts to the deposit of its components into the stream-of-commerce *plus* the reasonable expectation that it would be haled into Court there by a user of its products. The result comports with "fair play and substantial justice," and might serve as its paradigm.

Monsanto's motion to dismiss is hereby DENIED.

IT IS SO ORDERED.

---

**2.** Monsanto's retreat to *Pacific Atlantic Trading v. M/V Main Express*, 758 F.2d 1325 (9th Cir. 1985), as an expression of the Ninth Circuit's view is unpersuasive. There, the Court held that a Malaysian company which had executed an indemnity agreement in Malaysia had not purposefully availed itself of California, making jurisdiction improper. *Id.* at 1328. The facts are so far afield from the present case that only the result—jurisdiction improper—meekly argues for Monsanto's position. In *Pacific Atlantic*, the defendant company had almost no association with California, was a foreign national, was subject to Malaysian law, and California's interest was held to be "relatively weak." Compare the facts of present case and the result in *Pacific Atlantic* is undoubtedly distinguishable. *Id.* The result is further distanced from the present case by the *Pacific Atlantic* Court itself in footnote one.

It should be noted that the case cited by the district court to support the concept that one act may be sufficient to confer jurisdiction, *Raffaele v. Compagnie Generale Maritime*, 707 F.2d 395 (9th Cir.1983), was a products liability case involving the injury of a longshoreman from a negligently packed container. The West German defendant had previously stuffed 94 containers routed to the forum in the previous two years. The line of cases treating the delivery of products into the "stream of commerce" resulting in torts in the United States exemplifies a broader application because of the *strong state interest in protecting its citizens against harmful products. See, e.g., Plant Food Co–Op v. Wolfkill Feed & Fertilizer*, 633 F.2d 155 (9th Cir.1980). *Pacific Atlantic*, 758 F.2d at 1330, n. 1 (emphasis added). *Pacific Atlantic* recognizes the propriety of assessing jurisdiction in a case like this, where the defendants' activity in the state affects important state interests.