# IN THE SUPREME COURT OF IOWA

No. 13–1793

Filed March 6, 2015

Amended May 4, 2015

**DYLAN BOOK** and **KAREN BOOK,**

    Appellants,

vs.

VOMA TIRE CORPORATION, HUNTER ENGINEERING COMPANY, IOWA TIRE, INC., HOLT SALES AND SERVICE, INC., SICE, S.p.A. and SICE AUTOMOTIVE Equipment Societa Italiana Costruzioni Elettromeccaniche S.I.C.E.-S.p.A.,

    Defendants,

and

**DOUBLESTAR DONGFENG TYRE COMPANY, LTD.,**

    Appellee.

----------------------------------------------------------------------
VOMA TIRE CORPORATION, HUNTER ENGINEERING COMPANY
and IOWA TIRE, INC.,

    Third-Party Plaintiffs,

vs.

JIM BOOK, Individually and JIM BOOK d/b/a ALLEY AUTO SALES,

    Third-Party Defendant.

---

Appeal from the Iowa District Court for Dallas County, Bradley McCall, Judge.

Plaintiffs in products-liability action, who seek recovery for personal injuries from allegedly defective tire that exploded during inflation at Iowa workplace, appeal ruling dismissing Chinese tire manufacturer for lack of personal jurisdiction. **REVERSED.**

Neil Ray Chamberlin and James Bruce McMath of McMath Woods P.A., Little Rock, Arkansas, and Robert A. Nading II of Nading Law Firm, Ankeny, for appellants.

Kevin M. Reynolds of Whitfield & Eddy P.L.C., Des Moines, for appellee.

**WATERMAN, Justice.**

In this appeal, we must confront unsettled federal precedent to decide whether a Chinese tire manufacturer that sold thousands of tires in Iowa through an American distributor may be compelled to defend a lawsuit here consistent with the Due Process Clause of the United States Constitution. The tire exploded as an Iowan was airing it up at his father's business in Adel, Iowa. The Iowan suffered severe and permanent injuries and, through his mother, filed suit in his home county seeking recovery from the tire manufacturer, alleging the tire's design was defective and unreasonably dangerous and prone to explode during inflation. The manufacturer filed a motion to dismiss for lack of personal jurisdiction, which the district court granted. We retained the plaintiff's appeal.

This case presents our first opportunity to address the "stream of commerce" test for personal jurisdiction in a products-liability, personal-injury case since the United States Supreme Court's sharply divided decision in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. ___, ___, 131 S. Ct. 2780, 2785, 180 L. Ed. 2d 765, 772 (2011). For the reasons explained below, we hold that the Federal Constitution permits the exercise of personal jurisdiction over this high-volume, foreign manufacturer whose allegedly dangerous product purchased in Iowa injured a resident here. Accordingly, we reverse the district court's jurisdictional ruling and remand the case to proceed on the merits.

## I. Background Facts and Proceedings.

Jim Book owns and operates an auto repair shop, Alley Auto Sales in Adel, Iowa. In October 2009, Jim's seventeen-year-old son, Dylan Book, worked part-time for him through an apprenticeship affiliated with Dylan's high school. Jim agreed to sell and mount a new set of tires on a

customer's horse trailer. Jim bought from an Iowa retailer four LT 285/R16 10-ply Treadstone tires manufactured in China by Doublestar Dongfeng Tyre Company, Ltd. (Doublestar). On the morning of October 20, Jim began mounting the tires. When he tried to air one up, he had trouble getting the tire to seat properly on the wheel rim. He failed to realize he was attempting to mount a sixteen-inch tire on an older model 16.5" rim, a common mistake. Distracted by a phone call, Jim left the tire mounted on the wheel rim but underinflated. Dylan and a coworker, Cody Donnelly, stepped into the shop. Without talking to his father, Dylan began to air up the tire with Donnelly next to him.[1] The tire exploded, severely injuring Dylan. The explosion blinded Dylan in one eye and deprived him of part of his jaw, much of his sense of taste and smell, and left him with partial use of his left arm and hand. His injuries and rehabilitation have involved treatment by a dozen different medical specialists in this state.

Dylan's mother, Karen Book, filed a products-liability action in the Iowa District Court for Dallas County, their home county, seeking money damages for Dylan's personal injuries and medical expenses and her loss of consortium. The petition, filed October 8, 2010, initially named as defendants Hunter Engineering Company (the company that designed and sold the machine used to mount and inflate the tire); Iowa Tire, Inc. (the Iowa retailer that sold the accident tire to Alley Auto Sales); Holt Sales and Service, Inc. (the Iowa-based wholesaler that sold the accident tire to Iowa Tire); and Voma Tire Corporation (Voma), a national tire

---

[1]Steven Greenslade, a friend of Jim's and a first responder present when Dylan was taken away by ambulance, later testified Donnelly told him Dylan inflated the tire to eighty pounds of pressure per square inch (psi) while attempting to seat it, double the forty psi recommended. The petition alleges defendants failed to warn of the dangers of overinflation during mounting.

distributor that sold the accident tire to Holt. On April 20, 2012, plaintiffs amended their petition to name as additional defendants Doublestar and Societa Italiana Costruzioni Elettromeccaniche S.I.C.E. S.p.A. (SICE) (an Italian corporation that manufactured the mounting machine). Plaintiffs allege that the Treadstone tire used an unreasonably dangerous multistrand weftless bead prone to fail if the sixteen-inch tire is inflated on a 16.5" rim, a foreseeable occurrence.[2]

SICE and Doublestar filed motions to dismiss for lack of personal jurisdiction. In July 2012, the district court granted SICE's motion and deferred ruling on Doublestar's motion to allow jurisdictional discovery to "resolve the question of how the tire arrived in Iowa and . . . the number of times that tires have been shipped directly into Iowa and the volume of tires so shipped." The defendants answered interrogatories and requests for production and plaintiffs' counsel deposed corporate representatives of Doublestar and Voma. The evidentiary record establishes the following facts.

Doublestar is a Chinese corporation with its principal place of business in China. Doublestar manufactures tires in Shiyan City, located in Hubei Provence in central China. Doublestar, one of the ten largest tire manufacturers in China, produced nearly 3.2 million tires in the nine months preceding Dylan's accident.[3] Hundreds of thousands of

---

[2]The plaintiffs' petition alleged the mounting machine lacked an available safety feature to protect the person mounting the tire by holding the tire in place during an explosion. It also alleged that the machine's defective design enhanced the danger by providing a "launching pad" for the tire and wheel assembly to "project off" and injure or kill the mounter standing next to it.

[3]Doublestar's corporate designee testified that it manufactured 3,198,169 tires during the first nine months of 2009. Doublestar's appellate brief states, "About 50 percent of these tires were sold in China, 20–30 percent were sold in the United States, and the remainder of the tires were sold to other countries across the globe."

those Doublestar tires were sold in the United States in 2009 through two American distributors: Greenball Tire Corporation, based in California, and Voma. Doublestar has no employees or offices in the United States and does not advertise in this country.

Voma is a Tennessee corporation with its principal place of business in Memphis. Voma owns the "Treadstone" trademark and has been selling Treadstone tires since 2008. Doublestar is one of Voma's several tire suppliers. About twenty-five to thirty percent of Voma's sales in 2008 and 2009 were tires manufactured by Doublestar. Voma provided Doublestar with a mold to stamp "Treadstone" on the sidewall of these tires during the manufacturing process, and Voma exclusively sold the Treadstone tires in the United States. Voma's revenue from tire sales dropped from ten million dollars in 2010 to zero when it ceased selling tires by late 2012. Voma remained in business servicing warranty claims.

When Voma ordered tires from Doublestar in 2009, it provided detailed shipping requirements to the Chinese manufacturer. Doublestar delivered the tires F.O.B.[4] to a port in Wuhan, China. There, the shipping company placed the tires in containers to be loaded on freighters destined for the United States. Doublestar completed each order by providing instructions to the shipper as directed by Voma. To save on shipping costs, Voma frequently instructed Doublestar to have the tires shipped from China directly to distribution centers in states including Iowa, Oklahoma, and Texas.

---

[4]F.O.B. is a contract delivery term meaning "free on board," under which a seller's duties are discharged when the goods are put into the possession of the carrier, at which point the risk of loss passes to the buyer. *See* Iowa Code § 554.2319(1)(*a*) (2009).

Voma, not Doublestar, selected the destination of shipments from China and paid the shipping costs. Doublestar received the shipping instructions from Voma and directed the shipping company accordingly. Doublestar knew the destinations identified on the shipping documents containing Voma's requirements. Voma routinely sent Doublestar the bill of lading after each shipment was complete, which identified each destination. Doublestar in turn maintained a spreadsheet showing the destination for every tire it sold to Voma.

As of October 20, 2009, Voma had purchased 180,000 tires from Doublestar. Voma sold 16,700 of those Doublestar tires to Holt in Iowa. On sixteen occasions in 2008 and once in 2009, Voma instructed Doublestar to ship the tires directly from China to Holt in Des Moines, bypassing Voma's Tennessee facility. Those seventeen direct shipments from China to Iowa conveyed a total of 12,681 tires. None of those seventeen China-to-Iowa shipments included any 10-ply tires of the same model as the accident tire, but some of the containers included a similar 14-ply Treadstone tire. The Doublestar witness testified its employees knew some containers of tires were shipped directly to "Des Moines, IA" but denied those persons knew "IA" meant the State of Iowa.

Doublestar sold Voma 7008 of the 10-ply Treadstone tire model, the type involved in Dylan's accident, 999 of which Voma sold to Holt in Iowa. In the month leading up to Dylan's accident, Voma was selling approximately 150 of the 10-ply tires to Holt every two weeks. Voma shipped all of these 10-ply tires from its warehouse in Tennessee. The DOT number stamped on the accident tire indicates Doublestar manufactured it in China in early June of 2009. In 2009, Holt

purchased seven shipments of the 10-ply tires, all from Voma's warehouse in Tennessee.

In May 2013, after completion of jurisdictional discovery, the district court granted Doublestar's motion to dismiss. The district court made a factual finding that the accident tire was shipped from China to Voma's warehouse in Memphis and found no 10-ply tires were shipped directly to Iowa from China. The district court found the tires directly shipped from China to Des Moines were a different model. Plaintiffs dismissed their claims against the remaining parties on October 13, 2013, pursuant to a confidential settlement and appealed Doublestar's dismissal. We retained the appeal. At oral argument, counsel for Doublestar conceded that Doublestar would be subject to personal jurisdiction in Tennessee, Voma's home state.[5]

## II. Standard of Review.

" 'We review a district court's decision on a motion to dismiss for lack of personal jurisdiction for correction of errors at law.' " *Sioux Pharm, Inc. v. Summit Nutritional Int'l, Inc.*, 859 N.W.2d 182, 188 (Iowa 2015) (quoting *Shams v. Hassan*, 829 N.W.2d 848, 853 (Iowa 2013)). "We are not bound by the court's conclusions of law or application of legal principles. The district court's factual findings are binding on appeal if supported by substantial evidence." *Id.* (citation omitted).

"[W]e accept as true the allegations of the petition and the contents of uncontroverted affidavits." *Shams*, 829 N.W.2d at 853 (internal quotation marks omitted). "After the plaintiff makes a prima facie case

---

[5]In district court during oral argument on its motion to dismiss this Iowa action, counsel for Doublestar stated, "Perhaps personal jurisdiction [over Doublestar] would exist in the State of Tennessee where Voma is located." Doublestar has never contended in this action that it can only be sued in China.

showing that personal jurisdiction is appropriate, the burden shifts to the defendant to rebut that showing." *Id.*

### III. Analysis.

We must decide whether the Due Process Clause of the United States Constitution permits the exercise of personal jurisdiction over Doublestar in Iowa. This issue requires us to revisit the stream-of-commerce test of personal jurisdiction in light of *J. McIntyre Machinery* and its progeny. We conclude that the stream-of-commerce test as adopted in *World-Wide Volkswagen Corp.* and followed by our precedent remains good law. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490, 501–02 (1980); *Svendsen v. Questor Corp.*, 304 N.W.2d 428, 430–31 (Iowa 1981). We hold Doublestar, a large, high volume manufacturer selling to a national market, is subject to personal jurisdiction in Iowa based on its direct shipments to Iowa of thousands of tires and indirect shipments of thousands more to this state through its American distributor, including the allegedly hazardous "accident tire" that injured the Iowa plaintiff at his workplace in Iowa.

We begin by discussing the constitutional boundaries of personal jurisdiction. Next, we trace the development of the stream-of-commerce test and its competing formulations set forth in several divided opinions of the U.S. Supreme Court and applied inconsistently in the lower courts. Our survey of contemporary precedent nationwide persuades us the *Svendsen* test we have used in Iowa products-liability cases should be applied in this case, and we decline to adopt a more restrictive test as to a high-volume manufacturer of a potentially hazardous product. Finally, we apply the test and determine that Doublestar is subject to jurisdiction in Iowa in this products-liability action.

**A. Overview of Constitutional Limitations on Personal Jurisdiction.** Iowa's jurisdictional rule "authorizes the widest jurisdictional parameters allowed by the Due Process Clause." *Capital Promotions, L.L.C. v. Don King Prods., Inc.*, 756 N.W.2d 828, 833 (Iowa 2008); *see also* Iowa R. Civ. P. 1.306 ("Every corporation, individual, personal representative, partnership or association that shall have the necessary minimum contact with the state of Iowa shall be subject to the jurisdiction of the courts of this state . . . ."). Therefore, we confine our analysis to the federal constitutional requirements for personal jurisdiction.

"The Due Process Clause of the Fourteenth Amendment sets the outer boundaries of a state tribunal's authority to proceed against a defendant." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. ___, ___, 131 S. Ct. 2846, 2853, 180 L. Ed. 2d 796, 805 (2011). "The Due Process Clause protects an individual's right to be deprived of life, liberty, or property only by the exercise of lawful power." *J. McIntyre Mach.*, 564 U.S. at ____, 131 S. Ct. at 2786, 180 L. Ed. 2d at 773 (plurality opinion). "As a general rule, neither statute nor judicial decree may bind strangers to the State." *Id.* at ___, 131 S. Ct. at 2787, 180 L. Ed. 2d at 774. "A court may subject a defendant to judgment only when the defendant has sufficient contacts with the sovereign 'such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95, 102 (1945)). We recently reaffirmed that " '[f]airness is the crux of the minimum-contacts analysis.' " *Sioux Pharm*, 859 N.W.2d at 189 (quoting *Shams*, 829 N.W.2d at 854).

> The concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a

distant or inconvenient forum. And it acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.

*World-Wide Volkswagen Corp.*, 444 U.S. at 291–92, 100 S. Ct. at 564, 62 L. Ed. 2d at 498. Personal jurisdiction is only appropriate when "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297, 100 S. Ct. at 567, 62 L. Ed. 2d at 501. "Random or attenuated contacts with the forum state do not satisfy the minimum contacts test." *Ostrem v. Prideco Secure Loan Fund, LP*, 841 N.W.2d 882, 891 (Iowa 2014).

There are two forms of personal jurisdiction, general and specific. *Id.* at 892. General jurisdiction " 'refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose.' " *Id.* (quoting *Sondergard v. Miles, Inc.*, 985 F.2d 1389, 1392 (8th Cir. 1993)). General or "all-purpose" jurisdiction exists only when the defendant is "essentially at home in the forum State." *Goodyear*, 564 U.S. at ___, 131 S. Ct. at 2851, 180 L. Ed. 2d at 803; *see also Sioux Pharm*, 859 N.W.2d at 189, 194, 195 (applying *Goodyear* "at home" test). Neither party argues that general jurisdiction applies in this case, and we agree that Doublestar is not subject to general personal jurisdiction in Iowa.

"Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state . . . ." *Capital Promotions*, 756 N.W.2d at 833 (internal quotation marks omitted). "[S]pecific jurisdiction has become the centerpiece of modern jurisdiction theory, while general jurisdiction plays a reduced role." Mary Twitchell, *The Myth of General Jurisdiction*, 101 Harv. L. Rev. 610, 628 (1988); *accord Goodyear*, 564 U.S. at ___, 131 S. Ct. at 2854, 180

L. Ed. 2d at 806–07. Classically, the defendant must commit " 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Ostrem*, 841 N.W.2d at 892 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S. Ct. 1228, 1240, 2 L. Ed. 2d 1283, 1298 (1958)). In order to find the minimum contacts necessary for specific jurisdiction, the plaintiff must show two requirements:

> "Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, [due process] is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities."

*Capital Promotions*, 756 N.W.2d at 834 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 2182, 85 L. Ed. 2d 528, 540–41 (1985) (footnote omitted)). " 'If sufficient minimum contacts exist, the court must then determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.' " *Sioux Pharm*, 859 N.W.2d at 196 (quoting *Shams*, 829 N.W.2d at 857).

**B. The Stream-of-Commerce Doctrine.** The U.S. Supreme Court first used the stream-of-commerce test in *World-Wide Volkswagen Corp.*:

> [I]f the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

444 U.S. at 297–98, 100 S. Ct. at 567, 62 L. Ed. 2d at 501–02. Subsequent decisions, however, have "created significant confusion in lower courts over the constitutional standard for minimum contacts." *State ex rel. Edmondson v. Native Wholesale Supply*, 237 P.3d 199, 207 (Okla. 2010).

The Supreme Court's most recent decision on the stream-of-commerce test, *J. McIntyre Machinery*, failed to yield a majority opinion, and courts remain divided on what test to use in products-liability cases. *See AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1362–63 (Fed. Cir. 2012) (per curiam) (noting *J. McIntyre Machinery* "declined to resolve [the Supreme Court's] long-standing split on that theory" and left open questions unanswered in prior decisions); *Russell v. SNFA*, 987 N.E.2d 778, 790 (Ill. 2013) (noting the "lower federal and state courts struggled to reconcile [the Supreme Court's] competing standards for the stream-of-commerce theory" after *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987), and describing its precedent as " 'extremely balkanized' " (quoting *Wiles v. Morita Iron Works Co.*, 530 N.E.2d 1382, 1388 (Ill. 1988))). The Books argue this case is controlled by our long-standing Iowa precedent, *Svendsen*, applying the *World-Wide Volkswagen* test. Doublestar urges us to apply the more stringent "stream-of-commerce plus" test in the plurality opinion of *J. McIntyre Machinery*. We conclude our long-standing Iowa test remains good law and permits the exercise of personal jurisdiction over Doublestar here. We decline to employ the more stringent test to a high-volume manufacturer of an allegedly dangerous product. To explain why, we take a closer look at the development of the stream-of-commerce test.

In *World-Wide Volkswagen*, Harry and Kay Robinson, who lived in New York, purchased a new Audi sedan from a tri-state dealer there. *World-Wide Volkswagen Corp.*, 444 U.S. at 288–89, 100 S. Ct. at 562–63, 62 L. Ed. 2d at 495–96. A year later, they set out to drive to Arizona. *Id.* at 288, 100 S. Ct. at 562, 62 L. Ed. 2d at 495. As they drove through Oklahoma, another car struck their Audi in the rear, causing a fire that severely burned Kay and her two children. *Id.* The Robinsons filed a products-liability action in state court in Oklahoma, against the Audi manufacturer, the importer, the distributor, and the retail dealer, alleging "their injuries resulted from defective design and placement of the Audi's gas tank and fuel system." *Id.* at 288, 100 S. Ct. at 562, 62 L. Ed. 2d at 495–96. The foreign manufacturer, Audi NSU Auto Union Aktiengesellschaft, and the importer, Volkswagen of America, Inc., did not contest personal jurisdiction in Oklahoma. *Id.* at 288 n.3, 100 S. Ct. at 562 n.3, 62 L. Ed. 2d at 496 n.3. The distributor, World-Wide Volkswagen Corp., and retailer, Seaway Volkswagen, Inc., however, moved to dismiss for lack of personal jurisdiction. *Id.* at 288, 100 S. Ct. at 562–63, 62 L. Ed. 2d at 496. World-Wide and Seaway distributed and sold Audis in only three states: New York, New Jersey, and Connecticut. *Id.* at 288, 100 S. Ct. at 563, 62 L. Ed. 2d at 496. The Oklahoma trial court ruled the defendants were subject to personal jurisdiction, and the Oklahoma Supreme Court affirmed, reasoning that because a car is mobile, it was foreseeable someone would drive it to Oklahoma. *Id.* at 290, 100 S. Ct. at 563–64, 62 L. Ed. 2d at 497. The United States Supreme Court reversed, concluding that the mere foreseeability a party would drive their car into Oklahoma was insufficient to establish personal jurisdiction over the New York dealer and distributor. *Id.* at 295–96, 100 S. Ct. at 566, 62 L. Ed. 2d at 500. The Court held a state

can exercise jurisdiction only if the "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297, 100 S. Ct. at 567, 62 L. Ed. 2d at 501. A corporate defendant is on notice it is subject to suit when it " 'purposefully avails itself of the privilege of conducting activities within the forum State.' " *Id.* (quoting *Hanson,* 357 U.S. at 253, 78 S. Ct. at 1240, 2 L. Ed. 2d at 1298). The Court set forth the stream-of-commerce test quoted above and applied it to determine the New York dealer and distributor lacked the requisite contacts with Oklahoma. *Id.* at 299, 100 S. Ct. at 568, 62 L. Ed. 2d at 502.

We applied the *World-Wide Volkswagen* stream-of-commerce test a year later in *Svendsen,* 304 N.W.2d at 430–31. In that case, we concluded a Missouri manufacturer of billiards tables was subject to personal jurisdiction in Iowa when it sold a defective table to an Omaha distributor, who resold the table in Iowa where the plaintiff using it was injured. *Id.* at 429 n.1, 431. As we said:

> It is generally accepted that when a manufacturer voluntarily places his product in the stream of commerce, the constitutional requirement of minimum contacts will be satisfied in all states where the manufacturer can foresee that the product will be marketed.

*Id.* at 431. We concluded the close geographic proximity to Iowa of both the manufacturer and distributor combined with the marketing efforts of the parties made it foreseeable that the defendant's product would be used in Iowa. *Id.*

We later clarified *Svendsen* to note the mere foreseeability the product would enter the forum is insufficient to establish personal jurisdiction. *See Smalley v. Dewberry,* 379 N.W.2d 922, 924–25 (Iowa 1986). In *Smalley,* the plaintiff argued that because a trailer hitch is

mobile and could foreseeably be driven anywhere in the United States, the defendants should be subject to jurisdiction wherever the trailer traveled. *Id.* at 925. We concluded the foreseeability that matters is not simply that the product will enter the forum state, but rather that "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S. Ct. at 567, 62 L. Ed. 2d at 501). A few years later, we elaborated on the foreseeability requirement:

> We conclude that our *Smalley* holding in fact reaffirmed the *Svendsen* holding, stating "the manufacturer in *Svendsen* was indirectly, through others, seeking to secure a market in Iowa." 379 N.W.2d at 925. We find both *Svendsen* and *Smalley* to be consistent with the reasoning in *World-Wide Volkswagen*. In *Smalley . . .* , "foreseeability" concerned the foreseeability to defendants that their products would eventually cause harm in foreign states, hundreds of miles from their market area.

*State ex rel. Miller v. Baxter Chrysler Plymouth, Inc.*, 456 N.W.2d 371, 376 (Iowa 1990). We have not revisited the stream-of-commerce test since those decisions.

Meanwhile, the U.S. Supreme Court decided *Asahi*. *Asahi*, like this case, was a products-liability action for injuries caused by the failure of a tire manufactured in a foreign country. 480 U.S. 105–06, 107 S. Ct. at 1029, 94 L. Ed. 2d at 100. Gary Zurcher lost control of his Honda motorcycle on Interstate 80 in California when his rear tire suddenly lost air. *Id.* The collision severely injured Zurcher and killed his passenger and wife, Ruth Ann Moreno. *Id.* at 105, 107 S. Ct. at 1029, 94 L. Ed. 2d at 100. Zurcher brought a claim against Cheng Shin, the Taiwanese tire manufacturer, which in turn brought a claim for indemnity against Asahi Metal Industry Co., Ltd., the Japanese manufacturer of the tube valve

assembly. *Id.* at 106, 107 S. Ct. at 1029, 94 L. Ed. 2d at 100. Cheng Shin and the other defendants settled with the victim, leaving only Cheng Shin's indemnity claim against Asahi. *Id.* Asahi had no direct contacts with California. *Id.* at 106–07, 107 S. Ct. at 1029, 94 L. Ed. 2d at 100–01. Cheng Shin purchased up to 500,000 valve assemblies from Asahi annually, and sales to Cheng Shin accounted for only approximately one percent of Asahi's annual income. *Id.* at 106, 107 S. Ct. at 1029, 94 L. Ed. 2d at 101. Approximately twenty percent of Cheng Shin's U.S. sales were in California. *Id.* Taking a cue from *World-Wide Volkswagen,* the *Asahi* concurrence distinguished between " 'goods which reach a distant State through a chain of distribution and . . . goods which reach the same State because a consumer . . . took them there." *Id.* at 120, 107 S. Ct. at 1036, 94 L. Ed. 2d at 109 (Brennan, J., concurring in part and concurring in judgment) (quoting *World-Wide Volkswagen,* 444 U.S. at 306–07, 100 S. Ct. at 584, 62 L. Ed. 2d at 507 (Brennan, J., dissenting)).

The *Asahi* Court concluded that jurisdiction over Asahi did not comport with fair play and substantial justice, but could not reach a majority holding on minimum contacts. *Id.* at 105, 107 S. Ct. at 1028, 94 L. Ed. 2d at 100. Instead, Justice O'Connor, joined by Chief Justice Rehnquist and Justices Powell and Scalia, proposed one test, while Justice Brennan, joined by Justices White, Marshall, and Blackmun proposed another. *Compare id.* at 108–13, 107 S. Ct. at 1030–32, 94 L. Ed. 2d at 102–05, *with id.* at 116–21, 107 S. Ct. at 1034–37, 94 L. Ed. 2d at 107–10 (Brennan, J., concurring in part and concurring in judgment). Justice Stevens filed a third opinion concurring in part and concurring in the judgment, also joined by Justices White and

Blackmun. *Id.* at 121–22, 107 S. Ct. at 1037, 94 L. Ed. 2d at 110–11

(Stevens, J., concurring in part and concurring in judgment).

Under Justice Brennan's test:

The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise.

*Id.* at 117, 107 S. Ct. at 1034, 94 L. Ed. 2d at 107 (Brennan, J.,

concurring in part and concurring in judgment). By contrast, under

Justice O'Connor's test:

The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Id.* at 112, 107 S. Ct. at 1032, 94 L. Ed. 2d at 104 (plurality opinion).

Justice Stevens, writing separately, criticized the way Justice O'Connor

applied her "plus" test and offered a variation:

The plurality seems to assume that an unwavering line can be drawn between "mere awareness" that a component will find its way into the forum State and "purposeful availment" of the forum's market. Over the course of its dealings with Cheng Shin, Asahi has arguably engaged in a higher quantum of conduct than "[t]he placement of a product into the stream of commerce, without more. . . ." Whether or not this conduct rises to the level of purposeful availment requires a constitutional determination that is affected by the volume, the value, and the *hazardous character* of the components.

*Id.* at 122, 107 S. Ct. at 1037, 94 L. Ed. 2d at 111 (Stevens, J., concurring in part and concurring in judgment) (emphasis added) (citation omitted). The divided *Asahi* decision predictably led to a split in authority in the lower courts:

> With no guidance from the United States Supreme Court since its split decision in *Asahi*, the federal circuit courts and state courts have split on which "effects" test is applicable. The First, Fourth, Sixth, Ninth, and Eleventh Circuits employ the O'Connor "foreseeability plus" test. The Fifth, Seventh, and Eighth Circuits employ the Brennan "mere foreseeability" test. Other federal circuit courts have declined to decide the issue and instead use both tests when deciding whether a defendant has sufficient contacts with a state to justify jurisdiction. State courts are also significantly divided on the issue.

Angela M. Laughlin, *This Ain't the Texas Two Step Folks: Disharmony, Confusion, and the Unfair Nature of Personal Jurisdiction Analysis in the Fifth Circuit*, 37 Cap. U. L. Rev. 681, 703–06 & nn.129–33 (collecting cases).

Doublestar relies on *Humble v. Toyota Motor Co.*, in which Arakawa, a Japanese corporation, manufactured car seats and sold them to Toyota Motor Company, Ltd. in Japan, which installed them in vehicles to be sold in the United States. 727 F.2d 709, 710 (8th Cir. 1984) (per curiam). The district court dismissed the action for lack of personal jurisdiction, finding that Toyota made all marketing and sales decisions, and the Eighth Circuit affirmed in a per curiam opinion. *Id.* at 711. *Humble* is distinguishable because, unlike Arakawa, Doublestar shipped its products directly to the forum state at the direction of its American distributor. Moreover, the Court of Appeals for the Eighth Circuit caselaw supports jurisdiction in other respects.

Even before *World-Wide Volkswagen*, the Eighth Circuit held nonresident manufacturers could not avoid personal jurisdiction by using distributors as intermediaries:

> "Direct contact with the forum state is not essential to the exercise of personal jurisdiction. Metz may not have physically entered the state of Illinois, but it placed its flash devices in the stream of commerce under such circumstances that it should reasonably have anticipated that injury through infringement would occur there. We look to the economic and commercial realities of this case, and in our view, it is not within the contemplation of the concepts of fairness and due process to allow a wrongdoing manufacturer to insulate himself from the long arm of the courts by using an intermediary or by professing ignorance of the ultimate destination of his products."

*Hutson v. Fehr Bros., Inc.*, 584 F.2d 833, 838–39 (8th Cir. 1978) (quoting *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 1144 (7th Cir. 1975) (citations omitted)). More recently, the Eighth Circuit echoed its conclusion that foreign manufacturers cannot avoid jurisdiction by using intermediaries. *See Clune v. Alimak AB*, 233 F.3d 538, 542 (8th Cir. 2000) (noting Justice O'Connor's test was not supported by five justices). That case arose from a fatal workplace accident in Missouri using a hoist made in Sweden. *Id.* at 540. The *Clune* court concluded that personal jurisdiction existed over the Swedish manufacturer that had designed the hoist for a U.S. market; had agreements with U.S. distributors; displayed its label on its hoists; and through intermediaries, had sold between twenty and forty of the machines in Missouri. *Id.* at 543–44. The Eighth Circuit rejected the manufacturer's argument that it did not know where its products would end up once the ship left the Swedish port. *Id.* at 543 (" '[S]uch ignorance defie[d] reason and could aptly be labeled as "willful." ' " (quoting *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 613 (8th Cir. 1994))). *Clune* effectively applied Brennan's

broader stream-of-commerce test. Likewise, in *Barone*, the Eighth Circuit held Hosoya, a Japanese fireworks manufacturer, was subject to personal jurisdiction in Nebraska because it sold fireworks to a distributor that resold them in Nebraska. 25 F.3d at 611, 615. The *Barone* court applied a broad version of the stream-of-commerce test and focused on the fact that Nebraska was part of the Japanese company's distribution scheme, saying, "Hosoya has reaped the benefits of its network of distributors, and it is only reasonable and just that it should now be held accountable in the forum of the plaintiff's choice . . . ." *Id.* at 615. The Eighth Circuit used the broader stream-of-commerce test again in *Vandelune v. 4B Elevator Components Unltd.*, saying no direct marketing presence is necessary when a foreign manufacturer designed and labeled grain elevators for the Iowa market and sold 619 units in a year. 148 F.3d 943, 948 (8th Cir. 1998). As the court said,

> when a foreign manufacturer "pour[s] its products" into a regional distributor with the expectation that the distributor will penetrate a discrete, multi-State trade area, the manufacturer has "purposefully reaped the benefits" of the laws of each State in that trade area for due process purposes.

*Id.* (quoting *Barone*, 25 F.3d at 615).

We note that some courts rely on Justice Steven's conclusion that the jurisdictional analysis is "affected by the volume, the value, and the hazardous character" of the goods. *Asahi*, 480 U.S. at 122, 107 S. Ct. at 1037, 94 L. Ed. 2d at 110–11 (Stevens, J., concurring in part and concurring in judgment). One federal district court elaborated:

> Thus, Justice Stevens frames a test which satisfies the concerns of the entire Court. He requires that there be a stream-of-commerce *plus,* as Part II–A in *Asahi* argues, but requires only that the *plus* be a *reasonable* expectation of being subject to jurisdiction in the forum State. Justice Steven's [sic] view is also in closer accord with *World-Wide*

> *Volkswagen*'s "reasonableness" analysis than is Justice O'Connor's opinion which—opting for a list of rigid factors—eschews the careful, case-by-case consideration of a defendant's contacts and reasonable expectations. The reasonableness qualification on the stream-of-commerce test is further buttressed by the members of the Court who concurred with Justice Brennan in *Asahi,* where the axis of the agreement with the O'Connor plurality was in Part II–B, the "reasonableness" of assessing jurisdiction.
>
> The reasonableness qualification to the stream-of-commerce test, in contrast to Justice O'Connor's more objective but less realistic "plus" factors has the appeal of common-sense and fundamental fairness.

*Abuan v. Gen. Elec. Co.*, 735 F. Supp. 1479, 1486 (D. Guam 1990) (citations omitted). The *Abuan* court ruled that Monsanto, a bulk seller of Polychlorinated Biphenyls (PCBs), was subject to personal jurisdiction in Guam on personal injury claims arising from exposure to that chemical when a hose on an electrical transformer ruptured to spill that dangerous chemical there. *Id.* at 1480–81. The court found Monsanto had sold PCBs "by the railcar tank-load" to General Electric in Alabama. *Id.* at 1486. The court relied on the volume of the hazardous chemical sold in determining that Monsanto was subject to jurisdiction in other forums where GE installed the transformers containing PCBs. *Id.* at 1486–87. Other courts similarly have considered the hazardous nature of the product in determining personal jurisdiction. *See Morris v. SSE, Inc.*, 843 F.2d 489, 494 (11th Cir. 1988) ("Finally, we believe that the Sentinel Mark 2000 falls within Justice Stevens' 'hazardous product' category. . . . Thus it is clear that SSE was aware it was sending a hazardous product to Gulf Coast Air Sports . . . ."); *Seirus Innovative Accessories, Inc. v. Cabela's, Inc.*, No. 09-CV-102 JLS (WMC), 2009 WL 9141752, at *3 (S.D. Cal. Nov. 2, 2009) (applying Stevens's standard to the volume of products sold in California); *Osorio v. Dole Food Co.*, No. 07-22693-CIV, 2009 WL 48189, at *7, *11 (S.D. Fla. Jan. 5, 2009)

(discussing the hazardous-product rule and then applying it to the chemicals at issue); *Ex parte DBI, Inc.*, 23 So. 3d 635, 638 (Ala. 2009) (noting the parties conducted discovery on the volume, value, and hazardous character of the product to apply the Stevens test).

After *Asahi,* the Supreme Court did not revisit the stream-of-commerce test for almost twenty-five years, and when it did, the Court failed to speak in one voice. Instead, the Court was once again fragmented, with Justice Kennedy authoring the plurality opinion joined by Chief Justice Roberts, and Justices Scalia and Thomas, while Justice Breyer filed a concurring opinion joined by Justice Alito. *See J. McIntyre Mach.*, 564 U.S. at ___, 131 S. Ct. at 2785, 180 L. Ed. 2d at 772 (plurality opinion); *id.* at ___, 131 S. Ct. at 2791, 180 L. Ed. 2d at 778 (Breyer, J., concurring in judgment). Justice Ginsburg filed a dissenting opinion in which Justices Sotomayor and Kagen joined. *Id.* at ___, 131 S. Ct. at 2794, 180 L. Ed. 2d at 782 (Ginsburg, J., dissenting). In *J. McIntyre Machinery*, the Court reviewed a products-liability decision by the New Jersey Supreme Court. *Id.* at ___, 131 S. Ct. at 2786, 180 L. Ed. 2d at 772–73 (plurality opinion). The plaintiff seriously injured his hand while using a metal shearing machine manufactured in England and sold in New Jersey through a U.S. distributor. *Id.* No more than four machines sold by the manufacturer ended up in New Jersey and possibly only the one used by the plaintiff. *Id.* As the plurality put it, "The question here is whether the New Jersey courts have jurisdiction over J. McIntyre, notwithstanding the fact that the company at no time either marketed goods in the State or shipped them there." *Id.* at ___, 131 S. Ct. at 2786, 180 L. Ed. 2d at 772. The trial court dismissed the action for lack of personal jurisdiction, finding that the defendant " 'does not have a single contact with New Jersey short of the machine in

question ending up in this state.' " *Nicastro v. McIntyre Mach. Am., Ltd.*, 945 A.2d 92, 99 (N.J. Super. Ct. App. Div. 2008). The Superior Court of New Jersey, Appellate Division, reversed, reasoning that a distribution system designed to serve all fifty states constituted sufficient minimum contacts. *Id.* at 108. The New Jersey Supreme Court held J. McIntyre Machinery was subject to personal jurisdiction because "its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states," and its employees came to trade shows in other states. *Nicastro v. McIntyre Mach. Am., Ltd.*, 987 A.2d 575, 592 (N.J. 2010). The United States Supreme Court reversed, stating, "This Court's *Asahi* decision may be responsible in part for [the New Jersey Supreme Court's] error regarding the stream of commerce, and this case presents an opportunity to provide greater clarity." *J. McIntyre Mach.*, 564 U.S. at ___, 131 S. Ct. at 2786, 180 L. Ed. 2d at 773. The desired clarification, however, was not forthcoming.

Justice Kennedy's plurality opinion explicitly rejected Justice Brennan's approach in *Asahi* and endorsed Justice O'Connor's stricter version, stating, "The principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of a sovereign." *Id.* at ___, 131 S. Ct. at 2788, 180 L. Ed. 2d at 775.

> The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have *targeted* the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State.

*Id.* (emphasis added). The plurality concluded that although J. McIntyre Machinery marketed its goods in the United States generally, it did not

target New Jersey and, therefore, was not subject to jurisdiction. *Id.* at ___, 131 S. Ct. at 2791, 180 L. Ed. 2d at 778.

Justice Breyer and Justice Alito concurred in the judgment but rejected the plurality's reasoning. *Id.* at ___, 131 S. Ct. at 2793, 180 L. Ed. 2d at 780 (Breyer, J., concurring in judgment) (calling the plurality's test a "seemingly strict no-jurisdiction rule" and questioning the meaning of the "targeting" language as applied to modern online commercial markets). Instead, Justice Breyer's concurrence opined, "In my view, the outcome of this case is determined by our precedents." *Id.* at ___, 131 S. Ct. at 2791, 180 L. Ed. 2d at 778. The concurrence expressly limited the holding to the facts of the case and declined to adopt any broader rules. *Id.* at ___, 131 S. Ct. at 2792, 180 L. Ed. 2d at 779 ("None of our precedents finds that a single isolated sale . . . is sufficient."). To bolster his conclusion that a single sale is insufficient, Justice Breyer referred to Justice Stevens's statement in *Asahi* that the volume, value, and hazardous character of the product impacts the jurisdictional analysis. *Id.*

The three-justice dissent, authored by Justice Ginsburg, harshly criticized the plurality and the concurrence, stating:

> Inconceivable as it may have seemed yesterday, the splintered majority today "turn[s] the clock back to the days before modern long-arm statutes when a manufacturer, to avoid being haled into court where a user is injured, need only Pilate-like wash its hands of a product by having independent distributors market it."

*Id.* at ___, 131 S. Ct. at 2795, 180 L. Ed. 2d at 782 (Ginsburg, J., dissenting) (quoting Russell J. Weintraub, *A Map Out of the Personal Jurisdiction Labyrinth*, 28 U.C. Davis L. Rev. 531, 555 (1995) [hereinafter Weintraub]). The dissent pointedly criticized the plurality for relying on federalism principles rather than the Due Process Clause and argued

that J. McIntyre Machinery should be subject to jurisdiction in every state because of its decision to target a national market. *Id.* at ___, 131 S. Ct. at 2798–99, 180 L. Ed. 2d at 786–87. Without choosing between the competing stream-of-commerce tests from *Asahi*, the dissent argued that sufficient minimum contacts existed to satisfy either standard. *Id.* at ___, 131 S. Ct. at 2803, 180 L. Ed. 2d at 791. The dissent also collected cases upholding personal jurisdiction over foreign manufacturers targeting a nationwide market through U.S. distributors. *Id.* at ___ & n.19, 131 S. Ct. at 2804–06 & n.19, 180 L. Ed. 2d at 792–95 & n.19. Finally, the dissent invoked concerns of reasonableness and fairness by arguing manufacturers should be subject to personal jurisdiction anywhere their products cause injury:

> Is it not fair and reasonable, given the mode of trading of which this case is an example, to require the international seller to defend at the place its products cause injury? Do not litigational convenience and choice-of-law considerations point in that direction? On what measure of reason and fairness can it be considered undue to require McIntyre UK to defend in New Jersey as an incident of its efforts to develop a market for its industrial machines anywhere and everywhere in the United States? Is not the burden on McIntyre UK to defend in New Jersey fair, *i.e.*, a reasonable cost of transacting business internationally, in comparison to the burden on Nicastro to go to Nottingham, England to gain recompense for an injury he sustained using McIntyre's product at his workplace in Saddle Brook, New Jersey?

*Id.* at ___, 131 S. Ct. at 2800–01, 180 L. Ed. 2d at 788–89 (footnotes omitted). Justice Ginsburg concluded, "I take heart that the plurality opinion does not speak for the Court[.]" *Id.* at ___, 131 S. Ct. at 2804, 180 L. Ed. 2d at 792.

"When there is no majority opinion, the narrower holding controls." *Panetti v. Quarterman,* 551 U.S. 930, 949, 127 S. Ct. 2842, 2856, 168 L. Ed. 2d 662, 679 (2007) (citing *Marks v. United States,* 430 U.S. 188,

193, 97 S. Ct. 990, 993, 51 L. Ed. 2d 260, 266 (1977)); *State v. Iowa Dist. Ct.,* 801 N.W.2d 513, 522 (Iowa 2011) (same). We agree with the federal circuit courts of appeal that have concluded Justice Breyer's concurrence controls the holding of *J. McIntyre Machinery. See Williams v. Romarm, SA,* 756 F.3d 777, 784 (D.C. Cir. 2014); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.,* 753 F.3d 521, 541 (5th Cir. 2014); *AFTG-TG,* 689 F.3d at 1363. Justice Breyer's concurrence expressly relies on existing precedent and disclaims any new stream-of-commerce test. *J. McIntyre Mach.,* 564 U.S. at ___, 131 S. Ct. at 2794, 180 L. Ed. 2d at 782 (Breyer, J., concurring in judgment). Accordingly, the stream-of-commerce test of *World-Wide Volkswagen* and *Svendsen* remains good law and controlling precedent in Iowa after *J. McIntyre Machinery.*

Other state appellate courts likewise have interpreted *J. McIntyre Machinery* to conclude their existing precedent on the stream-of-commerce test remains good law. *See Russell,* 987 N.E.2d at 794 ("Accordingly, as in [*Wiles*], we will not adopt either the broad or narrow version of the [stream-of-commerce] theory without more definitive guidance from a majority of the United States Supreme Court."); *Jacobsen v. Asbestos Corp. Ltd.,* 119 So. 3d 770, 782 (La. Ct. App. 2013) (concluding that court is "free to continue . . . its use of the 'stream-of-commerce' theory"); *Butler v. JLA Indus. Equip., Inc.,* 845 N.W.2d 834, 846 (Minn. Ct. App. 2014) (distilling five guiding "principles" from *J. McIntyre Machinery* and continuing to apply its stream-of-commerce precedent in a five-factor test); *Sproul v. Rob & Charlies, Inc.,* 304 P.3d 18, 33 (N.M. Ct. App. 2012) ("Because *J. McIntyre Machinery* did not produce a majority opinion . . . pre-*Asahi* case law utilizing the approach set forth in *World-Wide Volkswagen* remains binding in New Mexico.").

The Books urge us to follow the Oregon Supreme Court's decision in *Willemsen v. Invacare Corp.*, in which a Taiwanese manufacturer of battery chargers, CTE, supplied chargers for motorized wheelchairs to an Ohio corporation, which then sold over one thousand wheelchairs to customers in Oregon. 282 P.3d 867, 869–70 (Or. 2012) (en banc). Plaintiffs sued CTE in Oregon after their mother died in a fire ignited by the defective battery, and CTE moved to dismiss for lack of personal jurisdiction. *Id.* The trial court denied the motion, and the Oregon Supreme Court denied CTE's petition for a writ of mandamus. *Id.* The United States Supreme Court granted CTE's petition for certiorari and remanded the case to the Oregon Supreme Court for reconsideration in light of *J. McIntyre Machinery*. *Id.* The Oregon Supreme Court determined that Justice Breyer's concurrence was the holding of *J. McIntyre Machinery* because it was the narrowest ground for the decision. *Id.* at 873. Under that holding, a single sale in a forum state is insufficient to establish personal jurisdiction over a manufacturer selling through a national distributor. *Id.* at 874. In *Willemsen*, by contrast, 1102 wheelchairs with the battery chargers had been sold in Oregon over a two-year period. *Id.* The Oregon Supreme court concluded that this volume was sufficient to constitute a " 'regular course' of sales." *Id.* at 875 (quoting *J. McIntyre Mach.*, 564 U.S. at ___, 131 S. Ct. at 2792, 180 L. Ed. 2d at 779). Therefore, the court concluded personal jurisdiction could be exercised over CTE in Oregon under a stream-of-commerce test. *Id.* at 877.

We believe the present case is a clearer case for personal jurisdiction than *Willemsen*. There was a regular course of sales of Doublestar's tires (not merely products containing Doublestar

components) into Iowa, and Doublestar actually shipped thousands of tires (albeit not the accident tire) into Iowa.

Doublestar's challenge to jurisdiction relies in part on our decision in *Capital Promotions*, a case that never mentions the stream-of-commerce test. 756 N.W.2d 828. That case was not a products-liability action and is factually inapposite. *Capital Promotions* involved intentional tort claims arising from a dispute between two boxing promoters over an Iowa-born prizefighter, Tye Fields. *Id.* at 830–31. Capital Promotions, an Iowa limited liability company based in this state, entered into a five-year exclusive promotional contract with Fields in 2000 when the boxer resided in Missouri. *Id.* at 831. Fields won a heavyweight title in 2003, prompting repeated efforts by Don King Productions to acquire the promotional rights for Fields, who had moved to Nevada. *Id.* Capital Promotions sued Don King Productions, a Delaware corporation based in Florida, for intentional interference with the Iowa entity's contract with Fields. *Id.* at 831–32. Don King had never promoted a prizefight in Iowa and had no Iowa office or employees. *Id.* at 831. The alleged interference took place during phone calls to Iowans and meetings in other states. *Id.* at 831–32. The district court dismissed the lawsuit for lack of personal jurisdiction, and the court of appeals affirmed. *Id.* at 832. On further review, we affirmed, applying the *World-Wide Volkswagen* test for personal jurisdiction along with the *Calder* effects test for intentional tort cases. *See id.* at 833–38. We see nothing in *Capital Promotions* that retreats from the stream-of-commerce test for products-liability actions.[6]

---

[6]The district court in this case relied on *Woodhurst v. Manny's Inc.*, an unpublished Iowa Court of Appeals decision that quotes Justice Kennedy's plurality opinion in *J. McIntyre Machinery* for the proposition that "[j]urisdiction may be exercised

We reiterate that *Svendsen* and *World-Wide Volkswagen* remain the controlling precedent for evaluating personal jurisdiction in products-liability cases. Yet, this case presents the opportunity to revisit our precedent to consider adopting Justice O'Connor's more stringent stream-of-commerce plus test, as urged by Doublestar.

**C. The Opportunity to Adopt the More Stringent Stream-of-Commerce Plus Test.** No consensus has emerged among the lower courts as to the competing tests for determining personal jurisdiction in products-liability actions. We decline to overrule our precedents to impose a more restrictive test that would limit access to justice in Iowa

---

'only where the defendant can be said to have targeted the forum.' " No. 12–0317, 2013 WL 1452929, *2 (Iowa Ct. App. April 10, 2013) (quoting *J. McIntyre Mach.*, 564 U.S. at ___, 131 S. Ct. at 2788, 180 L. Ed. 2d at 775 (plurality opinion)). In that case, an intoxicated patron at a tavern in Sabula, Iowa, shot the plaintiff. *Id.* at *1. The plaintiff brought a dramshop liability claim against a restaurant, Manny's, that served drinks to the shooter a few miles away in Savannah, Illinois. *Id.* The Iowa district court granted Manny's motion to dismiss for lack of personal jurisdiction. *Id.* at *2. The court of appeals affirmed, rejecting plaintiff's argument that jurisdiction could be based on advertisements and the close proximity to the Iowa border. *Id.* (noting the advertisements did not specifically target Iowans). The *Woodhurst* court appropriately distinguished *Svendsen* and *J. McIntyre Machinery* as follows:

> [The *Svendsen*] opinion involved a distinct factual scenario: a manufacturer's placement of an allegedly defective good into the "stream of commerce." *Svendsen,* 304 N.W.2d at 430. The "stream of commerce" concept permits "jurisdiction in products liability cases in which the product has traveled through an extensive chain of distribution before reaching the ultimate consumer." *Goodyear,* [564 U.S. at ___,] 131 S. Ct. at 2855[, 180 L. Ed. 2d at 807] (quotation marks and citation omitted); *accord J. McIntyre Mach. v. Nicastro,* [564 U.S. ___, ___,] 131 S. Ct. 2780, 2788[, 180 L. Ed. 2d 765, 775] (2011) ("[S]tream of commerce . . . refers to the movement of goods from manufacturers through distributors to consumers[.]"). The concept is inapposite here.

*Id.* The *Woodhurst* court followed our decision in *Meyers v. Kallestead*, 476 N.W.2d 65 (Iowa 1991), to affirm the dismissal of Manny's for lack of jurisdiction. *See id.* at *3; *see also Meyer,* 476 N.W.2d at 68 (affirming dismissal of Illinois tavern for lack of personal jurisdiction in Iowa). Neither case held that the Iowa or Illinois dramshop statutes apply extraterritorially to impose liability on the licensee for injuries inflicted in another state. We agree with the *Woodhurst* court that dramshop cases and products-liability cases are inapposite.

courts for residents of our state injured by allegedly defective products purchased here. Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law. *See Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 688 (Iowa 2013) ("We are slow to depart from stare decisis and only do so under the most cogent circumstances."); *State v. Derby*, 800 N.W.2d 52, 59 (Iowa 2011) ("We reiterate that we 'do not overturn our precedents lightly and will not do so absent a showing the prior decision was clearly erroneous.' " (quoting *McElroy v. State*, 703 N.W.2d 385, 394–95 (Iowa 2005) (collecting cases on stare decisis))); *Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 762 N.W.2d 463, 474 (Iowa 2009) (noting "raging controversy in the law" on implied-warranty issue in other jurisdictions with competing majority and minority rules and declining to disturb Iowa precedent based on stare decisis). Moreover, sound policy reasons cut against a more stringent test for jurisdiction over high-volume manufacturers in products-liability cases.

" 'Fairness is the crux of the minimum-contacts analysis.' " *Sioux Pharm.*, 859 N.W.2d at 189 (quoting *Shams*, 829 N.W.2d at 854). Is it unfair to compel a manufacturer selling thousands of products nationwide to defend its allegedly unsafe design in a state where its product was sold and injured a resident using it? We think not. *See Asahi*, 480 U.S. at 117, 107 S. Ct. at 1035, 94 L. Ed. 2d at 107 (Brennan, J., concurring in part and concurring in judgment) ("A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State[.]"). We adopted products liability to ensure that " 'the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market.' " *Hawkeye-Sec.*

*Ins. Co. v. Ford Motor Co.,* 174 N.W.2d 672, 683 (Iowa 1970) (quoting *Greenman v. Yuba Power Prods., Inc.*, 377 P.2d 897, 900 (Cal. 1963)). We would undermine that purpose if we closed the local courthouse door to injured consumers.

Significantly, the product at issue here is a tire with an allegedly dangerous design. We note Justice Stevens's concurrence in *Asahi* that the jurisdictional analysis "is affected by the volume, the value, and the *hazardous character* of the components." 480 U.S. at 122, 107 S. Ct. at 1037, 94 L. Ed. 2d at 111 (Stevens, J., concurring in part and concurring in judgment) (emphasis added). Plaintiffs allege in this case that the Doublestar tire design is prone to explode during reasonably foreseeable mounting mistakes. Indeed, the accident underlying this lawsuit resulted when Jim Book made the not uncommon mistake of attempting to mount a sixteen-inch tire on a 16.5" rim, and his son Dylan, the victim, overinflated the tire to attempt to get it seated.

We recognize the burden placed on alien defendants: "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Id.* at 114, 107 S. Ct. at 1033, 94 L. Ed. 2d at 105 (majority opinion). But, in this case, that concern is substantially diminished by Doublestar's concession that it is subject to personal jurisdiction in Tennessee. Doublestar does not identify any material additional burden it would face defending this case in Iowa instead of Tennessee. Nor does Doublestar contend it lacks the resources to defend this lawsuit in Iowa.

This case does not involve an isolated sale or a small manufacturer. *J. McIntyre Machinery* adjudicated personal jurisdiction over a foreign manufacturer in a state where no more than four of its

machines (and perhaps only one) had been sold. 564 U.S. at ___, 131 S. Ct. at 2786, 180 L. Ed. 2d at 773 (plurality opinion). We share the concern expressed in the concurring opinion for the plight of a small manufacturer:

> A rule like the New Jersey Supreme Court's would permit every State to assert jurisdiction in a products-liability suit against any domestic manufacturer who sells its products (made anywhere in the United States) to a national distributor, no matter how large or small the manufacturer, no matter how distant the forum, and no matter how few the number of items that end up in the particular forum at issue. What might appear fair in the case of a large manufacturer which specifically seeks, or expects, an equal-sized distributor to sell its product in a distant State might seem unfair in the case of a small manufacturer (say, an Appalachian potter) who sells his product (cups and saucers) exclusively to a large distributor, who resells a single item (a coffee mug) to a buyer from a distant State (Hawaii).

*Id.* at ___, 131 S. Ct. at 2793, 180 L. Ed. 2d at 781 (Breyer, J., concurring in judgment).

We decide only the case before us. Doublestar is not a small manufacturer. It manufactured over 3.1 million tires in the first nine months of 2009 alone and sold half of those internationally, including hundreds of thousands of tires to its American distributors in 2009. As we await further guidance from the fractured United States Supreme Court, we do not foreclose the possibility of revising the stream-of-commerce test for small nonresident sellers. We recognize such defendants may avoid personal jurisdiction when fairness and substantial justice dictate that outcome. Meanwhile, on this record, our existing *Svendsen* test is appropriate.

**D. Application of the *Svendsen–World-Wide Volkswagen* Test to Doublestar.** We conclude Doublestar is subject to personal jurisdiction in Iowa under the stream-of-commerce test set forth in

*World-Wide Volkswagen* and *Svendsen*. First, we hold Doublestar has the requisite minimum contacts with Iowa. In 2008–09, Doublestar shipped 12,681 tires directly to Des Moines, Iowa, for Voma. Doublestar's employees knew from the shipping documents these tires were going to "Des Moines, IA," and it is irrelevant that they were unaware "IA" stood for the State of Iowa.[7] Moreover, indirect shipments count. Voma shipped the accident tire and another 998 tires of the same model from Tennessee to Iowa for sale in this forum. Doublestar sold 180,000 tires to Voma for the U.S. market, and Voma shipped 16,700 of those tires to Holt for sale in Iowa. We are satisfied Doublestar at least indirectly served the Iowa market through Voma "with the expectation that [its tires] would be purchased by consumers in the forum State." *World-Wide Volkswagen,* 444 U.S. at 298, 100 S. Ct. at 567, 62 L. Ed. 2d at 502; *see also Svendsen,* 304 N.W.2d at 430–31 (noting minimum contacts are established when the manufacturer puts its goods into the stream of commerce with the expectation they will be marketed for sale in the forum).[8]

Nor can Doublestar avoid jurisdiction here by using intermediaries to serve the American and Iowa markets. *See Clune,* 233 F.3d at 543–44.

---

[7]The tires shipped from China directly to Iowa did not include the 10-ply accident tire or that model. But, Doublestar cites no authority, and we found none, supporting the proposition that we must disregard for jurisdictional purposes a manufacturer's shipments to the forum state of thousands of tires of a different model than the accident tire. Moreover, the Books allege the tires shipped directly to Iowa, although different models, had the same defective bead design as the accident tire.

[8]The nature of the alleged defect in this case—a tire prone to exploding during mounting on a mismatched rim—creates a risk of accidental injury likely to occur in the forum where the tire is sold because the tire must be mounted on the wheel rim prior to use. Doublestar thus can more readily foresee litigation in the state of sale, despite the inherent mobility of the product. This is not a case involving a consumer purchaser who brought a product purchased elsewhere into the forum state. Nor does this case involve a tire defect that causes blowouts while the operator drives the vehicle. In such cases, the location of the accident is fortuitous.

We agree with Justice Ginsberg that a manufacturer cannot " 'Pilate-like wash its hands of a product by having independent distributors market it.' " *J. McIntyre Mach.*, 564 U.S. at ___, 131 S. Ct. at 2795, 180 L. Ed. 2d at 782 (Ginsburg, J., dissenting) (quoting Weintraub, 28 U.C. Davis L. Rev. at 555). Under the test Justice Brennan articulated in *Asahi*, it is not necessary for a manufacturer to market the final product itself, "[a]s long as [it] *is aware that the final product is being marketed in the forum State*." *Asahi*, 480 U.S. at 117, 107 S. Ct. at 1034, 94 L. Ed. 2d at 107 (Brennan, J., concurring in part and concurring in judgment) (emphasis added). That awareness is shown by the direct shipments from China to Des Moines. Doublestar sold the tires to Voma in China and transferred the commercial risk of loss during shipping by delivering the tires F.O.B. at the Chinese port, but that mode of sale and shipment does not create immunity from tort liability or preclude jurisdiction in the destination where the tires are shipped. *See Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 471–72 (5th Cir. 2006) ("[W]e conclude that a F.O.B. term does not prevent a court from exercising personal jurisdiction over a non-resident defendant where other factors, such as the quantity and regularity of shipments, suggest that jurisdiction is proper.").

Having determined Doublestar has the requisite minimum contacts with Iowa, we next must decide " 'whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." ' " *Capital Promotions*, 756 N.W.2d at 834 (quoting *Burger King Corp.*, 471 U.S. at 476, 105 S. Ct. at 2184, 85 L. Ed. 2d at 543). To make this determination, we consider

> " 'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of

controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.' "

*Id.* (quoting *Burger King Corp.*, 471 U.S. at 477, 105 S. Ct. at 2184, 85 L. Ed. 2d at 543). " '[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.' " *Shams,* 829 N.W.2d at 857 (quoting *Burger King Corp.*, 471 U.S. at 477, 105 S. Ct. at 2184–85, 85 L. Ed. 2d at 544). As the *Burger King* Court further observed, "[m]ost such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional." *Burger King Corp.*, 471 U.S. at 477, 105 S. Ct. at 2185, 85 L. Ed. 2d at 544. We hold the exercise of personal jurisdiction over Doublestar comports with fair play and substantial justice.

We first address the burden on the defendant of litigating in this forum. Significantly, Doublestar has conceded it is subject to jurisdiction in Tennessee and has not shown defending this case here would be more burdensome than in that state. Next, the interest of plaintiffs and the State of Iowa strongly favor jurisdiction here. A Tennessee forum would be far more burdensome for the Books compared to their home county. Their interest in obtaining convenient relief at home clearly outweighs Doublestar's interest in avoiding Iowa in favor of Tennessee. "The State of Iowa has a strong interest in protecting its residents from damages resulting from the tortious acts of nonresident defendants." *Svendsen,* 304 N.W.2d at 431. Here, as in *Svendsen,* the injury occurred to an Iowa resident using defendant's product in Iowa. We recently reiterated that "Iowa has an interest in providing a forum for an ' "effective means of redress for its residents." ' " *Sioux Pharm,* 859

N.W.2d at 197 (quoting *Ostrem*, 841 N.W.2d at 903). "Iowa's interest in adjudicating a dispute concerning a tort that [oc]curred within its borders and [plaintiff's] interest in obtaining convenient relief outweigh any inconvenience to [defendant]." *Shams*, 829 N.W.2d at 860.

Systemic judicial interests also favor jurisdiction in Iowa because the key occurrence and damages witnesses are located here, not Tennessee. The trial would require testimony by the Books regarding the accident and Dylan's injury and recovery. Other witnesses located in Iowa include Cody Donnelly, who was present when the tire exploded, as well as the first responders, the dozen medical witnesses who treated Dylan, and possibly the employees of the former defendant Hunter Engineering who designed and sold the allegedly defective tire mounting machine.[9] Testimony of Iowa witnesses could be presented in Tennessee by deposition, but live, in-court testimony is preferable. *See Burke v. Quick Lift, Inc.*, 668 F. Supp. 2d 370, 382 n.11 (E.D.N.Y. 2009) ("[C]ourts have recognized that '[d]epositions, deadening and one-sided, are a poor substitute for live testimony especially where, as here, vital issues of fact may hinge on credibility. In determining credibility, there is nothing like the impact of live *dramatis personae* on the trier of the facts.'" (quoting *Polaroid Corp. v. Casselman*, 213 F. Supp. 379, 382 (S.D.N.Y.1962))); *State v. Rogerson*, 855 N.W.2d 495, 504, 507 (Iowa 2014) (discussing value of in-court testimony and reversing order that allowed remote real-

---

[9]Hunter Engineering is a released party whose fault could be included on the verdict form. *See* Iowa Code § 668.3(2)(*b*). Although Voma witnesses may be located in Tennessee, it appears unlikely Voma would be on the verdict form as a released party, given the statutory immunity available to distributors under Iowa Code section 613.18. Voma witnesses had relevant knowledge regarding jurisdiction; that issue is resolved in this opinion. Doublestar does not argue Voma witnesses located in Tennessee will be testifying at trial.

time testimony by video in criminal trial). These practical considerations favor trial in Iowa over Tennessee.

## IV. Disposition.

For these reasons, we hold that Doublestar is subject to personal jurisdiction in Iowa. Accordingly, we reverse the jurisdictional ruling of the district court and remand the case for further proceedings.

**REVERSED.**